Alphonzo HARRISON, #77662,
Petitioner,

v.

F. Warren BENTON, Dir. of Oklahoma Dept. of Corr., et al., Respondents.

No. CIV–76–0299–D.

United States District Court,
W. D. Oklahoma.

June 14, 1976.

Alphonzo Harrison, pro se.

Larry Derryberry, Atty. Gen., by Kay Karen Kennedy, Asst. Atty. Gen., Oklahoma City, Okl., for respondent.

## ORDER

DAUGHERTY, District Judge.

The above-named petitioner was convicted of Murder after a trial by jury and sentenced to life imprisonment. The questions presented in his habeas proceeding arise out of the cross-examination of petitioner concerning his previous convictions for other crimes.

■ It appears that in petitioner's trial conducted on October 8th and 9th, 1968, the petitioner was asked if he had been convicted "with assault to rob in Chicago on January 1, 1959." (Tr. 173.) The petitioner responded "January 16". The petitioner has admitted that in March, 1959, he was convicted upon his plea of guilty in the Circuit Court of Cook County, Illinois, case No. 59–558, of the crime of Assault with Intent to Rob and sentenced to serve a term of one to three years imprisonment. (See exhibit 7 to petitioner's Reply to the Assistant Attorney General's Response, Petition for Writ of Certiorari to the Supreme Court of the State of Illinois.) Herein he contends that since January 1, 1959, was New Years Day and he was not convicted on New Years Day, the prosecutor misled the jury with "an assumption that is materially untrue" concerning the former conviction. The argument is patently frivolous. The essential fact that the petitioner had been convicted of a felony in 1959 is uncontroverted. Whether the conviction occurred in January or March, 1959 is without constitutional significance. At·most it was a trial error and not subject to federal habeas review. ₀ See *Pierce v. Page*, 362 F.2d 534 (CA10 1966); *Alexander v. Daugherty*, 286 F.2d 645 (CA10 1965); *Schechter v. Waters*, 199 F.2d 318 (CA10 1952).

A more substantial complaint by the petitioner relates to the use by the prosecutor

of four allegedly constitutionally invalid convictions to impeach petitioner's credibility. On July 15, 1953, the petitioner under the name of Allan Parnell was tried and convicted in Municipal Court of Chicago, Illinois, of the criminal offense of Assault With a Deadly Weapon in case No. 53–MC–66005 and sentenced to a term of 60 days confinement. On August 10, 1954, again under the name of Allan Parnell the petitioner was convicted in the Municipal Court of Chicago in case No. 54–MCL–42405 of the offense of Petit Larceny of Property and sentenced to six months confinement and a $1.00 fine. On September 28, 1955, the petitioner was convicted in the Municipal Court of Chicago, case No. 55–MC–43005 of the crime of Willful and Malicious Assault With a Deadly Weapon Upon the Person of Another Without Any Considerable Provocation and Under Circumstances Showing an Abandoned and Malignant Heart With Intent Then and There to Inflict Bodily Injury and sentenced to confinement for a term of 90 days. In case No. 57–MCL–42985 of the Chicago Municipal Court the petitioner on December 23, 1957, was convicted of the crime of False Pretenses and sentenced to 60 days in custody. The petitioner admitted each of these convictions in reply to questions upon cross-examination by the prosecutor. (Tr. 172 and 173.) The petitioner now claims that he was without counsel in each of the four cases and because he was indigent and did not waive counsel, the convictions are constitutionally infirm because the court did not appoint an attorney for him.

 There can be no doubt that petitioner was entitled to court appointed counsel if indigent at the time of his misdemeanor convictions. *Argersinger v. Hamlin*, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972) established that an indigent defendant could not be deprived of his liberty in any criminal prosecution, whether felony or misdemeanor, in which he was not afforded the right to court appointed counsel. *Berry v. City of Cincinnati*, 414 U.S. 29, 94 S.Ct. 193, 38 L.Ed.2d 187 (1973) extended this rule retroactively. *Loper v. Beto*, 405 U.S. 473, 92 S.Ct. 1014, 31 L.Ed.2d

374 (1972) held that it was constitutional error to use for impeachment purposes previous convictions which were constitutionally invalid under *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

There does not appear to be any real factual issue as to whether the petitioner had counsel at the time of his misdemeanor convictions. It seems clear that he did not. However, it has never been judicially determined whether the petitioner was in fact indigent or whether he may have waived counsel. In petitioner's application for post conviction relief in the Oklahoma sentencing court no evidentiary hearing was conducted. In petitioner's appeal to the Oklahoma Court of Criminal Appeals from the District Court's denial of post conviction relief the appeals court assumed that the convictions were constitutionally invalid but concluded that any error "was harmless beyond reasonable doubt and did not contribute to the verdict rendered."

 In determining whether an evidentiary hearing is required in this court, this court has followed the approach of the Oklahoma courts and examined the record to ascertain whether, even though the convictions may have been void, the error was harmless beyond a reasonable doubt. The conclusion of the Oklahoma court is, of course, not binding upon this court and before this court can declare the error harmless this court "must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Use of prior convictions unconstitutionally obtained in violation of the right to counsel in subsequent trials is not of such constitutional magnitude that such introduction can never be harmless. *Thomas v. Savage*, 513 F.2d 536 (CA5 1975). The error resulting from introduction for impeachment purposes of such constitutionally tainted convictions may be harmless beyond reasonable doubt under the circumstances of a particular case. *Bates v. Nelson*, 485 F.2d 90 (CA9 1973), cert. denied, 414 U.S. 1134, 94 S.Ct. 877, 38 L.Ed.2d 759. *Tucker*

*v. United States*, 431 F.2d 1292 (CA9 1970), affmd., 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592.

The slaying of Clarence Reed took place on a Saturday afternoon, July 20, 1968, in a pool hall at 321 N.E. 2nd in Oklahoma City. The first witness for the State was Florence Johnson. She was sitting on a stool near a pop case at the front of the pool hall visiting with Bernie Lewis and the victim Reed. She first saw the petitioner when he hit Reed with the stem of a bumper jack from behind. He hit Reed again and Reed tried to run towards the back of the pool hall and petitioner pursued him with the jack stem. Reed did not try to hit back and did not have a weapon. When the trouble started she was anxious to get out of the place and did not see what happened in the rear portion of the room.

The next witness for the State was Dr. James G. Luke, State Medical Examiner for the State of Oklahoma. He performed an autopsy on the body of Clarence Reed on July 21, 1968. His examination revealed massive head injuries and he stated the cause of death was multiple fractures of the skull on the right subdural hematoma. In his opinion the injuries were inflicted by a blunt instrument and would be consistent with the ridges found on the stem of an ordinary tire jack. He stated in fact that this was the only item that he knew that could cause something like the structures that he found.

The next witness was Bernie Lewis. He was standing at the front of the pool hall looking out the window, visiting with Florence Johnson and Clarence Reed. Reed was bent over the pop case talking to Florence Johnson. He saw a car pull up and a fellow jump out with a jack. The man entered and hit Reed with two licks with the jack. Reed had no weapon and ran toward the back of the pool hall where he fell and the man kept hitting him with the jack. He could not identify the petitioner as the man with the jack.

Three police officers testified who participated in the investigation of the homicide. One of them testified that after the petitioner had been advised of his rights, he told the police officer on the way to the police station that after the incident he had panicked and driven out to the country and thrown the jack stem into the weeds and that he did not think he could find it again. According to this police officer the petitioner also stated that the victim had owed him some money and would not pay him, and the only way he was going to be able to get it was to take it out of his hide.

Another eyewitness for the State was Ted L. Morgan. He was playing dominoes in the back of the room, he heard a commotion up front and looked up to see Reed running towards the back. The petitioner was right behind him and Reed stumbled and fell and the petitioner was right on top of him and the petitioner had the stem of the bumper jack in both hands and this witness saw him strike the victim over five times. Reed had no weapon and as he fell the witness heard him say "okay man, okay man" and then he didn't say any more. He then heard the petitioner say "well, you'll never go in anybody else's pocket anymore". The operator of the pool hall, Elizah Robinson, then came back with his gun in his hand and told the petitioner "don't kill him in here" to which the petitioner replied "okay".

Elizah Robinson, the operator of the pool hall, testified that he was standing between two tables when he first saw the petitioner. Reed was running toward the back and the petitioner was chasing him with the jack in his hand. Reed then stumbled and he saw the defendant hit him at least twice with the jack which he was holding in both hands. The petitioner was standing over him and Reed was laying on the floor. He heard the petitioner say "well, you won't rob anybody else". He got his gun and stopped the petitioner whom he told not to hit the victim any more. He said that when the petitioner looked and saw his gun he then replied "I won't hit him no more." The petitioner then told him to call the law and walked out the front door.

The State then rested and the petitioner took the stand as the sole witness for the

defense. He stated that he was 34 years old and a tuberculosis patient. On December 26, 1967 and June 3, 1968, the victim had robbed him of all the money he had. On the morning of July 20, 1968, Reed again broke in and took from the petitioner all of his money. The petitioner was then in bed sick and was not able to get out of bed until around noon when he went outside. He saw one Willis whose last name he could not recall. He asked Willis to drive him to his mother's. Willis agreed to do so but wanted to return a jack which he had borrowed first. Willis took the jack into the pool room accompanied by the petitioner. As they entered Reed pulled a knife from his pocket and Willis handed to the petitioner the jack which then came apart in three pieces. He testified that Reed roughed him into the wall striking him with his fist. The petitioner hit Reed's arm and knocked the knife out of his hand. Reed had a shirt pocket full of money which the petitioner could see and he asked Reed to give him his money back because he was sick and he needed it. Reed didn't say anything but hit him again and then ran. The petitioner hollered for the people in the pool hall to stop him. According to the petitioner Reed ran to the back where he was grabbed by others. One of the people hit him with the other piece of the jack and shoved him right back to the petitioner where both fell to the floor. Reed fell on top of the petitioner and the petitioner in a sitting position hit Reed and pushed him off. He insisted that he never hit Reed from behind and denied any intention to kill Reed. After the incident he gave the jack in the pool hall to Willie Mapp who was the owner.

In Rebuttal the State recalled Bernie Lewis who testified he did not see the person with the jack come in with anyone and reiterated that he did not see Reed hit anybody or pin anybody up against the wall and he did not see Reed with a knife. The State also produced another eyewitness, Odell R. Hendricks. He was also in the back playing dominoes when he heard a commotion and turned around. He also saw Reed running and fall with the peti-

tioner standing above him striking him four or five times with the jack. He testified that he never saw the petitioner in a prone or sitting position.

■ The court instructed on defendant's theory of self-defense but did not instruct on Manslaughter or other included offenses. The jury found the petitioner guilty and fixed his punishment at life imprisonment. Unless there is a reasonable possibility that the questioned evidence contributed to the result in petitioner's case he is not entitled to relief. *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). The jury had to either find him guilty as charged or to acquit him. The court is satisfied beyond a reasonable doubt that in light of the extremely strong case presented by the State, the jury would not have acquitted petitioner, even if there had been no mention of the challenged convictions. Since the petitioner received the least sentence which the jury could impose, obviously these convictions did not adversely influence the punishment which he received.

In *Loper v. Beto*, supra, the prosecution's case depended solely upon the testimony of Loper's eight year old stepdaughter to establish that Loper was the perpetrator of the crime. Here the State presented the testimony of five eyewitnesses that the victim was unarmed and the brutal attack upon him was unprovoked and unrelenting in its fury. His credibility was impeached by the absolute contradiction of his story and that related by these witnesses. He denied his statement to the policeman concerning the disposition of the weapon. The testimony of the medical examiner concerning the number, location and severity of the victim's injuries could not be reconciled with petitioner's account. The petitioner's credibility was further impeached by the one valid prior felony conviction in 1959. His version was uncorroborated. The defense did not produce any witnesses who might have corroborated his story such as George Edwards who supposedly visited the petitioner in his room after the robbery on the morning of the .homicide, Willis who allegedly handed him the jack, Willie Mapp

the owner of the jack and the person to whom the petitioner said he gave the jack stem after the assault. According to petitioner's own testimony there were 40 to 50 people in the pool hall at the time, and yet he was not able to present to the jury a single person to support his description of what occurred, a fact undoubtedly not lost upon the jury.

In *United States v. Faulkenberry*, 472 F.2d 879 (CA9 1973), cert. denied, 411 U.S. 970, 93 S.Ct. 2161, 36 L.Ed.2d 692, where the defendant's defense was contradicted by the testimony of six other witnesses the court found that the use of three presumably invalid convictions to impeach the defendant was harmless beyond a reasonable doubt. In *Gilday v. Scafati*, 428 F.2d 1027 (CA1 1970) the court found the error of admitting three uncounseled convictions to be harmless beyond a reasonable doubt in light of the quantum of direct evidence against the defendant and the fact that his credibility was so severely impaired by his own testimony. The conclusion of the court in *Subilosky v. Moore*, 443 F.2d 334, 336 (CA1 1971) in considering the prejudicial impact of four invalid convictions used to impeach, aptly expresses the judgment of the court in this case:

"We do not feel on the record as a whole that there has been any miscarriage of justice, of a constitutional nature or otherwise. In the light of the relative insignificance of the admission of the defendant's uncounseled conviction and the persuasiveness of the other evidence offered by the Commonwealth, we conclude that the trial court's error was harmless beyond a reasonable doubt."

As evidenced by the foregoing analysis no evidentiary hearing is required in this case and the Petition for Writ of Habeas Corpus will be denied.

IT IS SO ORDERED.